FILED
11/28/2022
Clerk of the
Appellate Courts

# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
Assigned on Briefs October 3, 2022

## IN RE CAYSON C., ET AL.

**Appeal from the Juvenile Court for Grainger County**
**No. 2021-JV-39     Steven Lane Wolfenbarger, Judge**

_____

## No. E2022-00448-COA-R3-PT
_____

This appeal concerns the termination of a mother's parental rights. The Tennessee Department of Children's Services ("DCS") filed a petition in the Juvenile Court for Grainger County ("the Juvenile Court") seeking to terminate the parental rights of Pamela C. ("Mother") to her minor children Cayson S.-C. and Chaston C. ("the Children," collectively). After a hearing on the termination petition, the Juvenile Court entered an order terminating Mother's parental rights to the Children. Mother appeals. We vacate the ground of failure to manifest an ability and willingness to assume custody because the Juvenile Court failed to make specific findings regarding the second prong of that ground. We find that all other grounds found by the Juvenile Court were proven by clear and convincing evidence. We find further, as did the Juvenile Court, that termination of Mother's parental rights is in the Children's best interest. We affirm as modified.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court**
**Affirmed as Modified; Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which ANDY D. BENNETT and KENNY W. ARMSTRONG, JJ., joined.

Whitney P. Trujillo, Strawberry Plains, Tennessee, for the appellant, Pamela C.

Jonathan Skrmetti, Attorney General and Reporter, and Amber L. Barker, Assistant Attorney General, for the appellee, the Tennessee Department of Children's Services.

# OPINION

## Background

Cayson S.-C. was born to Mother in June 2014; Chaston C. was born to Mother in May 2016. Bryan S. ("Father") is the Children's father.[1] In July 2019, DCS received a referral that the Children were exposed to drugs. Upon an investigation by DCS, the Children were found with their grandmother. In August 2019, Mother was located, and she agreed to complete a non-custodial permanency plan to work toward achieving sobriety. In November 2019, DCS filed a petition seeking to control Mother's conduct and alleging that the Children were dependent and neglected. The Juvenile Court ordered the Children into DCS custody. The Juvenile Court subsequently entered an order adjudicating the Children dependent and neglected. In December 2019, a permanency plan—the first of four—was created for Mother. Under the first permanency plan, Mother's responsibilities included: complete a mental health assessment; complete an alcohol and drug assessment; submit to random drug screens; maintain a safe and stable home; refrain from incurring new legal charges; and maintain contact with DCS. The three succeeding permanency plans retained the same essential responsibilities. In September 2020, the Juvenile Court entered an order finding that a child born to Mother during the custodial episode, a half-sibling of the Children but who is not a subject of this appeal, was a victim of severe child abuse at Mother's hands due to in utero exposure to methamphetamine and THC. The record on appeal does not reflect that Mother ever appealed this finding of severe child abuse.

On June 10, 2021, DCS filed a petition in the Juvenile Court seeking to terminate Mother's parental rights to the Children. DCS alleged the following grounds: (1) abandonment by failure to visit; (2) abandonment by failure to support; (3) abandonment by failure to provide a suitable home; (4) substantial noncompliance with the permanency plans; (5) persistent conditions; (6) severe child abuse; and (7) failure to manifest an ability and willingness to assume custody. DCS alleged further that termination of Mother's parental rights is in the Children's best interest.

This case was tried on February 15, 2022. While neither parent appeared at the hearing, counsel for Mother and Father were present. Before the witnesses testified, the following exchange occurred concerning the whereabouts of the parents:

> THE COURT: Okay. Is the Rule requested?

---

[1] Father did not appeal the Juvenile Court's order terminating his parental rights to the Children. We relate facts about Father only to the extent they bear on Mother's case.

MR. LONG [counsel for Father]: No, Your Honor. But just on a preliminary matter, I'd like to make a Motion for a Continuance. My client is not here. Since it's a Termination, I would just want my client here to participate.

MS. BEIER [counsel for Mother]: I need to make the same Motion, Your Honor.

THE COURT: Okay. Very well. So are the parents on notice regarding today's proceeding?

MS. LAWSON [counsel for DCS]: Yes, Your Honor. Both parents have been served. They have -- actually [Mother] was here earlier. She was arrested for three capiases issued for failure to appear issued out of Child Support Court. She bonded out and left.

As far as [Father] goes, I don't think he's been here since 2020.

THE COURT: Okay. All right. So I am going to respectively overrule the Motion. If I granted it, I don't know that we would be in any different posture at the next setting. And particularly if mother was here in the building for other business today, arrested, made bond, and left the premises, I cannot find good cause to grant a Continuance. Okay. All right.

You can call your first witness.

DCS elected not to proceed on two of the grounds it pled in its petition— abandonment by failure to visit and failure to provide a suitable home. First to testify was Kandi Kirk ("Kirk"), a DCS foster care case worker assigned to the Children's case. The Children were removed into DCS custody in November 2019. Over time, several different case managers were assigned to the case. Kirk was assigned to the Children's case in December 2021. She reviewed the case record prior to trial. Asked why the Children were removed into foster care, Kirk stated: "So the parents had a history of failing drug screens for methamphetamine. And when the Department attempted to engage the parents, the parents did not cooperate and the children were then bench ordered into custody." From July 2021, after DCS filed its petition, Mother paid $137.16 in child support for Chaston and $537.16 for Cayson. Mother had been ordered to pay $55 per child per month in child support. Kirk said that Mother paid no child support before DCS filed its termination petition. Mother had signed the Criteria and Procedures for Termination of Parental Rights.

Next, Kirk testified to Mother's degree of compliance with her permanency plans. Mother completed a mental health assessment. Mother also completed rehab, but she had not followed through on recommendations. On February 8, 2022, Kirk spoke with Mother and asked for her address. Mother refused to provide her address. At that time, Kirk also drug tested Mother, which saw Mother test positive for THC and methamphetamines. Kirk testified that if the Juvenile Court did not terminate Mother's parental rights at this time, DCS would request that Mother undergo another alcohol and drug assessment in light of

-3-

her testing positive for drugs a week before the hearing. As to where Mother lived, Kirk said that Mother "reportedly" lived with her boyfriend, Wesley G. Wesley G. has a "lengthy history with the Department" and, according to Kirk, would not able to complete a background check for the Children to return to that home. However, Kirk did not know the nature of Wesley G.'s history with DCS. Kirk stated further that Mother had not provided her with proof of employment. Continuing her testimony, Kirk stated:

Q. Now Ms. Kirk, the Petition has also pled persistent conditions against [Mother]. So you just stated -- I'm sorry -- how long have the children been in foster care?
A. Since 2019, so for two years and three months.
Q. Okay. And the reasons for removal, can you refresh your memory on that?
A. Yes. The parents were -- they had a history of failing drug screens for methamphetamines. They were failing to cooperate with the Department and they were bench ordered into custody.
Q. So what conditions still exist in [Mother's] home that would prevent her from regaining custody of the children at an early date?
A. She's still continuing to fail drug screens for methamphetamines and she's not cooperating with the Department.
Q. And you don't know where she lives; correct?
A. That is correct.
Q. And you don't know if anyone lives with her?
A. That is correct.

Kirk said that Mother had not demonstrated a willingness to assume custody of the Children; did not consistently pay child support or exhibit an ability to provide for the Children financially; did not have a suitable home to her knowledge; did not show she could provide stability and care for the Children; and had not addressed her drug addiction. Kirk also said that, in her opinion, placing the Children in Mother's legal or physical custody, or under her financial responsibility, would pose a risk of substantial harm to the physical or psychological welfare of the Children. In December 2020, Mother pled guilty to simple possession of a Schedule VI substance, for which she was placed on probation. In May 2021, she pled guilty to DUI first offense. Kirk testified that Mother went to jail twice during the custodial episode. Kirk said that, in her opinion, adoption was in the Children's best interest of achieving permanency.

On cross-examination, Kirk acknowledged that Mother paid some child support after DCS filed its termination petition. Kirk said Mother was not currently employed. Mother had a suspended driver's license. Kirk stated that Mother had been arrested the morning of the hearing for nonpayment of child support. However, Mother was released.

-4-

Kirk had no record of Mother completing intensive outpatient therapy. Kirk testified: "[Mother] hasn't done anything that we've asked of her as far as following through on any of the recommendations on the Permanency Plan." Kirk had spoken to Mother about setting up parent-child visits, but Mother did not attend. Asked if Mother gave any reason for her failure to attend, Kirk said: "The first reason, she said she didn't have any gas money. And the second time, she did not give me a reason."

Next and last to testify was Garren R. ("Foster Father"), one of the Children's foster parents. The Children had been in Foster Father's home since February of 2020. Foster Father stated that he tried to maintain communication with Mother, including setting up video calls. However, Mother's participation was sporadic. Foster Father testified that Mother's contact with the Children, such that it occurred, was not meaningful or engaging. Regarding his line of work, Foster Father is a home health nurse. When the Children first arrived in Foster Father's care, Cayson was underweight to the 20th percentile. Cayson threw tantrums, as well. The Children were placed on a routine, and now have a stable environment. When he entered Foster Father's care, Cayson suffered from hearing loss. He also has undergone a tonsillectomy and an adenoidectomy. The Children attend "play therapy" twice a month. Mother once sent Foster Father's spouse a text asking how therapy was going. Regarding whether the Children displayed an attachment to Mother, Foster Father said "the boys don't talk about her unless they know for sure that a visit is happening." Chaston seemed a "little happy" to visit with Mother, whereas Cayson showed no interest in her. The visits were "hit or miss." Foster Father said: "We did it weekly and from like February of 2021 to, I think you're looking at June the 9th, I've got [Mother] completing a total of five video calls." The week before the hearing, Mother had a video call with the Children for around fifteen minutes. Foster Father stated that he loves the Children, and he and his spouse wish to adopt them.

Following trial but prior to the entry of the final judgment, Mother filed a "motion to reconsider" in which she requested an opportunity to be present for a new trial. In her motion, Mother asserted that she was at the courthouse on the morning of trial; that she was arrested for nonpayment of child support; that it was determined her arrest was in error and she was released; that she inquired about her court date and waited until the last name on the docket came up; that nobody was left there; and she finally left. Mother did not file an affidavit in support of her motion to reconsider. Mother's motion was heard on April 5, 2022. The Juvenile Court denied the motion. In its order denying Mother's motion, the Juvenile Court stated: "Mother stated that she thought the hearing was over and left the building. DCS objected to the Motion." Applying Rule 310 of the Tennessee Rules of Juvenile Procedure, the Juvenile Court found: "[A]n order shall be set aside based upon fraud or mistake or newly discovered evidence. Mother was present the day of the proceeding and left prior to the commencement of the hearing. The Court finds that no mistake, fraud, or discovery of new evidence is present."

In April 2022, the Juvenile Court entered an order terminating Mother's parental rights to the Children. The Juvenile Court found, by clear and convincing evidence, that five grounds for termination were proven against Mother: (1) abandonment by failure to support; (2) substantial noncompliance with the permanency plans; (3) persistent conditions; (4) severe child abuse; and (5) failure to manifest an ability and willingness to assume custody. The Juvenile Court found further, also by clear and convincing evidence, that termination of Mother's parental rights is in the Children's best interest. The Juvenile Court found as follows, in part:

[Abandonment by Failure to Support]

The relevant lookback period in this case with respect to the ground of abandonment by failure to support is the four-month period between February 10, 2021, and June 9, 2021.

The Court specifically finds that neither parent paid any child support during the relevant four-month period of time immediately preceding the filing of the Petition to Terminate Parental Rights. [Mother was] ordered to pay $55.00 per child per month by this Court on February 3, 2020. Moreover, there is no indication in the record that either parent was disabled or incapable of performing work during the relevant lookback period. [Mother] signed the Criteria for Termination of Parental Rights on multiple occasions....

***

[Substantial Noncompliance with the Permanency Plans]

It is important for courts to view a parent's compliance realistically and logically in light of the purpose for which step is included. In every plan, there are certain core requirements that are more critical to facilitating reunification of a family than others. Logically, these "core" steps are designed to correct the conditions and problems that necessitated the child's removal in the first place. Merely counting the number or percentage of steps completed by a parent does not meet the test of substantial noncompliance. Each step must be viewed individually to determine its importance and how it relates to the overall goals of the plan. If the most critical or core steps remain uncompleted, then the underlying problems that necessitated removal of the child have not been resolved and reunification is not a viable option.

Four permanency plans were created and ratified during this custodial episode. The Court finds that the goals of the respective plans were

reasonably related to remedying the conditions that led to the children's removal, and that DCS acted reasonably during all stages of this matter.

The parents were required to complete mental health assessments, alcohol and drug assessments, have a legal source of income, obtain and maintain safe and suitable housing, resolve all legal issues and refrain from incurring new charges, submit to random drug screens, regularly visit the child, and obtain a transportation plan.

While it appears that [Mother] completed a mental health assessment and admitted herself into a rehabilitation program, the evidence shows that she left her treatment program prior to completion, failed to enroll in an intensive outpatient program, and will not disclose where she lives.

The Court would further note that Mother is believed to reside with her paramour, Wesley [G.], who has an extensive history with DCS. Mother's last drug screen on February 8, 2022, indicated positive results for methamphetamine. Mother has provided no proof of reliable transportation and was arrested prior to this hearing for failure to pay child support. Although Mother was released on bail earlier today, she failed to appear for this trial.

\*\*\*

For these reasons, the Court finds by clear and convincing evidence that [Mother]… failed to substantially comply with the permanency plans created for [her] by DCS, and that the steps developed in the plans were reasonably related to remedying the reasons for the children's removal.

\*\*\*

[Persistent Conditions]

Looking back at the reasons that led to the children's removal on November 5, 2019, the Court cannot find any evidence of significant improvement by [Mother]. Therefore, the conditions that existed at the time of the children's removal two years ago continue to persist today. Numerous reasons for removal were cited in testimony: drug issues, inappropriate housing, and criminal issues, to state a few.

[Mother] tested positive for methamphetamine on a drug screen administered only a week prior to this hearing. She was arrested and released on bail before this trial began. She refuses to disclose where she lives.

The Court finds by clear and convincing evidence that the conditions that led to the children's removal still persist; there is little likelihood that

these conditions will be remedied at an early date so that the children could safely return to the home; and that that continuation of the parent-child relationship greatly diminishes the children's chances of being placed into a safe, stable, and permanent home.

***

[Severe Child Abuse]

On September 29, 2020, the Grainger County Juvenile Court adjudicated the children's half-sibling, Miya [G.], dependent and neglected and held that [Mother] had severely abused the child due to her continued use of methamphetamine during her pregnancy.

The Court finds that the adjudication was a final order that was not appealed.

***

[Failure to Manifest an Ability and Willingness to Assume Custody]

The first prong of this ground provides that the petitioner must prove that the parent has failed to "manifest an ability and willingness to personally assume legal and physical custody or financial responsibility" of the child.

***

Accordingly, this Court's analysis addresses whether the petitioner has proven by clear and convincing evidence whether the parents have failed to manifest either the ability or the willingness to assume legal and financial responsibility for this child.

Neither parent paid child support commensurate with any requirement of them under the Child Support Guidelines or any court order. Moreover, the Court finds that the parents have provided no support other than [Father] sending $10.00 to the children. During this custodial episode, the children never received birthday gifts and received Christmas gifts for the first time in December 2021.

Neither parent has provided any proof that they are ready to assume physical custody of the children. [Mother] refused to provide an address to her DCS case manager…. The Court further finds that both parents have lengthy and ongoing criminal episodes. In fact, [Mother] was arrested on this date prior to this hearing.

For these reasons, the Court finds by clear and convincing evidence that the grounds set forth in Tenn. Code Ann. § 36-1-113(g)(14) have been met, that the parents failed to demonstrate that they are able to assume physical and financial responsibility of the children, and that placing the children in the legal or physical custody of either parent would pose a risk of substantial risk [sic] of harm to the physical or psychological welfare of the children.

***

[Best Interest]

(A) and (B) The Court finds that the children are in a loving pre-adoptive home and have stability and continuity of placement. The children had physical and emotional issues when they were removed into foster care. The children attend play therapy twice per week, and their foster parents are very supportive of their treatment. Their emotional wellness has improved while in their foster home, and the Court finds that a change of caretaker and physical environment would likely be detrimental to the emotional, psychological, and medical conditions of these children.

(C) The parents have provided very little support and have failed to demonstrate an ability to provide for the children in a meaningful way. Their housing situation is unknown. In fact, [Mother] refused to provide her address to her case worker.…

(D) and (E) The Court finds that the children and parents have no significant attachment, and it is unlikely that such an attachment could be fostered at this point.… [W]hile [Mother] has visited with the children, it is sporadic in nature. Her last visit with the children was via video for approximately fifteen minutes one week ago. Prior to that, [Mother] last visited with the children the week after Christmas 2021.

(F) and (G) The Court does not consider these factors in its best interest analysis, as there is no evidence of whether the children are fearful of living in either of the parents' homes. The Court would note that the parents' living conditions are unknown.

(H) The children are well bonded with their foster parents. It is apparent that the foster parents love these children and have developed a nurturing relationship and wish to adopt the children. The Court finds that the children have created a healthy parental attachment to other persons in the absence of the parents.

(I) Although the Court cannot make a clear finding as to this factor, it is noted that the children are well bonded with their foster parents and have developed friendships with a child in their neighborhood.

(J) The parents have failed to make any lasting adjustments of their circumstances, conduct, or conditions. [Mother] tested positive for methamphetamine a week ago. Both parents continue to incur criminal charges.

(K) and (L) The goals and requirements of the permanency plans were reasonably related to remedying the reasons for removal. DCS exercised reasonable efforts in attempting to assist the parents; however, [Mother] … failed to take advantage of any resources or assistance provided by DCS.

(M) The Court does not consider this factor in its best interest analysis.

(N) The Court does not consider this factor in its best interest analysis.

(O), (P), and (Q) … [Mother] admitted to using methamphetamine and smoking marijuana at the time of the children's removal, and she continues to use methamphetamine. The Court finds that neither parent has ever provided safe and stable care for the children, and they have failed to demonstrate an understanding of the basic and specific needs required for the children to thrive, or an ability to maintain a home that meets those specific needs.

(R) Again, the current living conditions of the parents are unknown.

(S) The parents have provided nothing other than token child support for the children.

(T) The Court finds that mental and emotional fitness of the parents would be detrimental to the children and would likely prevent the parents from consistently and effective providing safe and stable care and supervision of the children. Particularly as demonstrated by their ongoing substance abuse and criminal activity.

For these reasons, the Court finds by clear and convincing evidence that, based upon the considerations set forth in Tenn. Code Ann. § 36-1-113(i), that it is in the best interest of the children for the parental rights of [Mother] … to be terminated.

Mother timely appealed to this Court.

## Discussion

We restate and consolidate Mother's issues on appeal as follows: 1) whether the Juvenile Court erred in denying Mother's motion to reconsider; 2) whether Mother's due process rights were violated and Mother was deprived of an opportunity to adequately

cross-examine the witness when the DCS case manager testified largely through case records which were not entered into evidence; 3) whether the Juvenile Court erred in finding grounds for termination; and 4) whether the Juvenile Court erred in finding that termination of Mother's parental rights is in the Children's best interest.

As our Supreme Court has instructed regarding the standard of review in parental rights termination cases:

> A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions.[2] *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as *parens patriae* has a special duty to protect minors . . . .' Tennessee law, thus, upholds the [S]tate's authority as *parens patriae* when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745, 747, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *In re Angela E.*, 303 S.W.3d at 250. "When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it." *Santosky*, 455 U.S. at 759, 102 S.Ct. 1388. "Few consequences of judicial action are so grave as the severance of natural family ties." *Id*. at 787, 102 S.Ct. 1388; *see also M.L.B. v. S.L.J.*, 519 U.S. 102, 119, 117 S.Ct. 555, 136 L.Ed.2d 473 (1996). The parental rights at stake are "far more precious than any property right." *Santosky*, 455 U.S. at 758-59, 102 S.Ct. 1388. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of "severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(*l*)(1); *see also Santosky*, 455 U.S. at 759, 102 S.Ct. 1388 (recognizing that a decision terminating parental rights is "*final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally

---

[2] U.S. Const. amend. XIV § 1 ("[N]or shall any State deprive any person of life, liberty, or property, without due process of law . . . ."). Similarly, article 1, section 8 of the Tennessee Constitution states "[t]hat no man shall be taken or imprisoned, or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed or deprived of his life, liberty or property, but by the judgment of his peers or the law of the land."

entitled to "fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754, 102 S.Ct. 1388; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty., N.C.*, 452 U.S. 18, 27, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981) (discussing the due process right of parents to fundamentally fair procedures).

Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof – clear and convincing evidence. *Santosky*, 455 U.S. at 769, 102 S.Ct. 1388. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

Tennessee statutes governing parental termination proceedings incorporate this constitutionally mandated standard of proof. Tennessee Code Annotated section 36-1-113(c) provides:

> Termination of parental or guardianship rights must be based upon:
>
> (1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and
> (2) That termination of the parent's or guardian's rights is in the best interests of the child.

This statute requires the State to establish by clear and convincing proof that at least one of the enumerated statutory grounds[3] for termination exists and that termination is in the child's best interests. *In re Angela E.*, 303 S.W.3d at 250; *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "The best interests analysis is separate from and subsequent to the determination that there is clear and convincing

---

[3] Tenn. Code Ann. § 36-1-113(g)(1)-(13).

evidence of grounds for termination." *In re Angela E.*, 303 S.W.3d at 254. Although several factors relevant to the best interests analysis are statutorily enumerated,[4] the list is illustrative, not exclusive. The parties are free to offer proof of other relevant factors. *In re Audrey S.*, 182 S.W.3d at 878. The trial court must then determine whether the combined weight of the facts "amount[s] to clear and convincing evidence that termination is in the child's best interest." *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). These requirements ensure that each parent receives the constitutionally required "individualized determination that a parent is either unfit or will cause substantial harm to his or her child before the fundamental right to the care and custody of the child can be taken away." *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999).

Furthermore, other statutes impose certain requirements upon trial courts hearing termination petitions. A trial court must "ensure that the hearing on the petition takes place within six (6) months of the date that the petition is filed, unless the court determines an extension is in the best interests of the child." Tenn. Code Ann. § 36-1-113(k). A trial court must "enter an order that makes specific findings of fact and conclusions of law within thirty (30) days of the conclusion of the hearing." *Id*. This portion of the statute requires a trial court to make "findings of fact and conclusions of law as to whether clear and convincing evidence establishes the existence of each of the grounds asserted for terminating [parental] rights." *In re Angela E.*, 303 S.W.3d at 255. "Should the trial court conclude that clear and convincing evidence of ground(s) for termination does exist, then the trial court must also make a written finding whether clear and convincing evidence establishes that termination of [parental] rights is in the [child's] best interests." *Id*. If the trial court's best interests analysis "is based on additional factual findings besides the ones made in conjunction with the grounds for termination, the trial court must also include these findings in the written order." *Id*. Appellate courts "may not conduct de novo review of the termination decision in the absence of such findings." *Id*. (citing *Adoption Place, Inc. v. Doe*, 273 S.W.3d 142, 151 & n. 15 (Tenn. Ct. App. 2007)).

### B. Standards of Appellate Review

An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). *In re Bernard T.*, 319 S.W.3d at 596; *In re Angela E.*, 303 S.W.3d at

---

[4] Tenn. Code Ann. § 36-1-113(i).

246. Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. *In re Bernard T.*, 319 S.W.3d at 596; *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. *In re M.L.P.*, 281 S.W.3d at 393 (quoting *In re Adoption of A.M.H.*, 215 S.W.3d at 810). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d at 246.

*In re Carrington H.*, 483 S.W.3d 507, 521-24 (Tenn. 2016) (footnotes in original but renumbered). In conjunction with a best interest determination, clear and convincing evidence supporting any single ground will justify a termination order. *E.g., In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). Mother does not challenge severe child abuse, one of the five grounds found against her. Nevertheless, the Tennessee Supreme Court has instructed "that in an appeal from an order terminating parental rights the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal." *In re Carrington H.*, 483 S.W.3d at 525-26 (footnote and citation omitted). Therefore, we will review each of the grounds found against Mother.

Five grounds for termination are at issue. On June 10, 2021, when DCS filed its termination petition, the statutory grounds at issue read as follows:

(g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and nonexclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:
(1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred;
(2) There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan pursuant to title 37, chapter 2, part 4;

-14-

(3)(A) The child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:
(i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;
(ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and
(iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home;
(B) The six (6) months must accrue on or before the first date the termination of parental rights petition is set to be heard;
(4) The parent or guardian has been found to have committed severe child abuse, as defined in § 37-1-102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights or the petition for adoption to have committed severe child abuse against any child; [and]

***

(14) A parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]

Tenn. Code Ann. § 36-1-113(g) (West April 22, 2021 to June 30, 2021).

With regard to the abandonment ground at issue, the ground of abandonment by failure to support was defined as follows:

(1)(A) For purposes of terminating the parental or guardian rights of a parent or parents or a guardian or guardians of a child to that child in order to make that child available for adoption, "abandonment" means that:
(i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding, pleading, petition, or any amended petition to terminate the parental rights of the parent or parents or the guardian or

-15-

guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents or the guardian or guardians either have failed to visit or have failed to support or have failed to make reasonable payments toward the support of the child;

\*\*\*

(B) For purposes of this subdivision (1), "token support" means that the support, under the circumstances of the individual case, is insignificant given the parent's means;

\*\*\*

(D) For purposes of this subdivision (1), "failed to support" or "failed to make reasonable payments toward such child's support" means the failure, for a period of four (4) consecutive months, to provide monetary support or the failure to provide more than token payments toward the support of the child. That the parent had only the means or ability to make small payments is not a defense to failure to support if no payments were made during the relevant four-month period;

\*\*\*

(F) Abandonment may not be repented of by resuming visitation or support subsequent to the filing of any petition seeking to terminate parental or guardianship rights or seeking the adoption of a child;

\*\*\*

(H) Every parent who is eighteen (18) years of age or older is presumed to have knowledge of a parent's legal obligation to support such parent's child or children; [and]
(I) For purposes of this subdivision (1), it shall be a defense to abandonment for failure to visit or failure to support that a parent or guardian's failure to visit or support was not willful. The parent or guardian shall bear the burden of proof that the failure to visit or support was not willful. Such defense must be established by a preponderance of evidence. The absence of willfulness is an affirmative defense pursuant to Rule 8.03 of the Tennessee Rules of Civil Procedure[.]

Tenn. Code Ann. § 36-1-102(1) (West March 6, 2020 to June 30, 2021).

We first address whether the Juvenile Court erred in denying Mother's motion to reconsider. In denying Mother's motion, the Juvenile Court applied Rule 310 of the Tennessee Rules of Juvenile Procedure.[5] Mother argues that the Juvenile Court erred in so doing as the Tennessee Rules of Civil Procedure apply to parental rights termination cases. *See State ex rel. Turner v. Bryant*, No. W2006-01463-COA-R3-JV, 2008 WL 2388630, at *3 (Tenn. Ct. App. June 12, 2008), *no appl. perm. appeal filed* ("Still other proceedings, such as the termination of parental rights and child custody proceedings, are governed by the Tennessee Rules of Civil Procedure.") (Footnote and citation omitted). Mother contends that Tenn. R. Civ. P. 60.02 would have been the appropriate rule to apply in this context.[6] For its part, DCS concedes that the Juvenile Court erred in applying the Tennessee Rules of Juvenile Procedure, but argues that the error was harmless in this instance. DCS argues that, since Mother's motion to reconsider was filed after the Juvenile Court's oral ruling but before the Juvenile Court entered its final judgment, it should be treated as a Tenn. R. Civ. P. 59.04 motion to alter or amend. *See Ferguson v. Brown*, 291 S.W.3d 381, 387 (Tenn. Ct. App. 2008) ("Rule 59.04 allows a party to seek relief from a judgment within thirty days after being entered; conversely, Rule 60.02 affords a party a means to seek relief from a final, non-appealable judgment.") (citation omitted). With respect to Rule 59.04 motions to alter or amend, this Court has stated:

> The purpose of a Rule 59.04 motion to alter or amend a judgment is to provide the trial court with an opportunity to correct errors before the judgment becomes final. *Bradley v. McLeod*, 984 S.W.2d 929, 933 (Tenn. Ct. App. 1998) (overruled in part on other grounds by *Harris v. Chern*, 33 S.W.3d 741 (Tenn. 2000)). The motion should be granted when the

---

[5] Tennessee Rule of Juvenile Procedure 310(b) provides:

**(b) Relief from Judgments or Orders.** An order of the court shall be set aside if it is determined that:
(1) It was obtained by fraud or mistake sufficient to satisfy the legal requirements for relief in any other civil action;
(2) The court lacked jurisdiction over a necessary party or of the subject matter; or
(3) Newly discovered evidence so requires. The court must determine that, with regard to such newly discovered evidence, the movant was without fault in failing to present such evidence at the original proceeding, and that such evidence may have resulted in a different judgment at the original proceeding.
[6] Tenn. R. Civ. P. 60.02 provides, as pertinent:

On motion and upon such terms as are just, the court may relieve a party or the party's legal representative from a final judgment, order or proceeding for the following reasons: (1) mistake, inadvertence, surprise or excusable neglect; (2) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party; (3) the judgment is void; (4) the judgment has been satisfied, released or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that a judgment should have prospective application; or (5) any other reason justifying relief from the operation of the judgment.

controlling law changes before the judgment becomes final; when previously unavailable evidence becomes available; or to correct a clear error of law or to prevent injustice. *Id*. A Rule 59 motion should not be used to raise or present new, previously untried or unasserted theories or legal arguments. *Local Union 760 of Intern. Broth. of Elec. Workers v. City of Harriman*, No. E2000-00367-COA-R3[-]CV, 2000 WL 1801856, at *4 (Tenn. Ct. App. Dec. 8, 2000) *perm. app. denied* (Tenn. May 14, 2001), *see Bradley*, 984 S.W.2d at 933 (holding: a Rule 59 motion should not be used to raise new legal theories where motion for summary judgment is pending).

*In re M.L.D.*, 182 S.W.3d 890, 895 (Tenn. Ct. App. 2005).

Mother is correct in that the Juvenile Court erred in applying Rule 310 of the Tennessee Rules of Juvenile Procedure to deny her motion to reconsider as the Tennessee Rules of Juvenile Procedure do not govern parental rights termination cases. However, not every error committed by a trial court necessarily constitutes reversible error. *See* Tenn. R. App. P. 36(b) ("A final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process."). Mother's "motion to reconsider" relied on no legal authority.

To determine whether the Juvenile Court erred in its disposition of Mother's motion, we must characterize the motion according to its substance. As the Juvenile Court had not entered its final judgment when Mother filed her motion, we agree with DCS that it should be treated as a Tenn. R. Civ. P. 59.04 motion to alter or amend rather than a motion for relief from judgment under Tenn. R. Civ. P. 60.02. We review a trial court's ruling on a Tenn. R. Civ. P. 59.04 motion to alter or amend a judgment using the abuse of discretion standard. *See Chambliss v. Stohler*, 124 S.W.3d 116, 120 (Tenn. Ct. App. 2003).[7] The Tennessee Supreme Court has explained that "[a] court abuses its discretion when it causes an injustice to the party challenging the decision by (1) applying an incorrect legal standard, (2) reaching an illogical or unreasonable decision, or (3) basing its decision on a clearly erroneous assessment of the evidence." *Fisher v. Hargett*, 604 S.W.3d 381, 395 (Tenn. 2020) (internal quotation marks omitted) (quoting *Harmon v. Hickman Cmty. Healthcare Servs., Inc.*, 594 S.W.3d 297, 305-06 (Tenn. 2020)).

---

[7] A trial court's decision on whether to grant a motion for continuance, the underlying subject of Mother's motion, likewise is reviewed under the abuse of discretion standard. *In re Braylee B.*, No. E2020-01408-COA-R3-PT, 2021 WL 1977187, at *7 (Tenn. Ct. App. May 18, 2021), *R. 11 perm. app. denied August 11, 2021*.

-18-

Mother argues that the Juvenile Court "may have ruled differently if the proper standard had been used." We are unpersuaded that the Juvenile Court's outcome would have been different under Tenn. R. Civ. P. 59.04, which we deem applicable, or Tenn. R. Civ. P. 60.02, as advocated by Mother. Though it did not say so explicitly, the Juvenile Court plainly did not credit Mother's excuse for her non-attendance at the hearing. Mother fails to explain how the Juvenile Court's applying a different standard would have altered its basic conclusion that her excuse was invalid. In addition, we note that Mother failed to support her motion with an affidavit attesting to her version of events. Although the Juvenile Court applied an incorrect legal standard, we find that this error was harmless as it did not more probably than not affect the judgment or result in prejudice to the judicial process. In addition, we find that the Juvenile Court's decision neither was illogical, unreasonable, nor based on a clearly erroneous assessment of the evidence. In sum, we find no abuse of discretion in the Juvenile Court's denial of Mother's motion to reconsider.

We next address whether Mother's due process rights were violated and Mother was deprived of an opportunity to adequately cross-examine the witness when the DCS case manager testified largely through case records which were not entered into evidence. Mother states that Kirk, the DCS case worker who testified at trial and had only been on the Children's case for about six weeks, relied on her review of internal records for her testimony. Mother says these records never were properly entered into evidence and she never had a chance to object. Thus, Mother argues her due process rights were violated. In support of her position, Mother cites to *In re Amora S.*, No. E2021-00338-COA-R3-PT, 2021 WL 4704674, at *7 (Tenn. Ct. App. Oct. 8, 2021), *no appl. perm. appeal filed*, a case in which a father appealing the termination of his parental rights challenged the trial court's consideration of certain exhibits which were "premarked" but never properly admitted into evidence. DCS argued, as it does here, that the issue was waived for failure to timely object. *Id*. We disagreed in *In re Amora S.*, stating that "[b]ecause DCS counsel never moved to admit the exhibits into evidence, Father was not given an opportunity to object to their admission." *Id*. We ultimately found the error was harmless because the trial court's reliance on the improperly-considered evidence was insignificant in view of the other admissible evidence supporting its decision. *Id*. In response, DCS argues, in part, that Mother waived her challenge to Kirk's testimony because she failed to timely object to it. DCS argues further that Kirk was not reading from un-admitted case recordings, but rather from affidavits entered into evidence without objection as Collective Exhibit 1.

We find that *In re Amora S.* is distinguishable from the present case. At issue in *In re Amora S.* were physical documents, certain exhibits "premarked" but never properly admitted into evidence. Here, the evidence at issue is not exhibits but instead testimony. Mother had an opportunity at trial to object to Kirk's testimony for the reasons she challenges it now, but Mother failed to do so. A failure to timely object can be consequential. As this Court has explained:

-19-

The contemporary objection rule is an elementary principle of trial practice. Parties who desire to object to the admission of evidence must make their objection in a timely manner and must state the specific basis for their objection. *Overstreet v. Shoney's, Inc.*, 4 S.W.3d 694, 702 (Tenn. Ct. App. 1999). Parties cannot obtain relief on appeal from an alleged error they could have prevented. Tenn. R. App. P. 36(a). Therefore, failing to make an appropriate and timely objection to the admission of evidence in the trial court prevents a litigant from challenging the admission of the evidence on appeal. *Welch v. Bd. of Prof'l Responsibility*, 193 S.W.3d 457, 464 (Tenn. 2006); *State ex rel. Smith v. Livingston Limestone Co.*, 547 S.W.2d 942, 944 (Tenn. 1977); *Ottinger v. Stooksbury*, 206 S.W.3d 73, 78 (Tenn. Ct. App. 2006).

*Levine v. March*, 266 S.W.3d 426, 440 (Tenn. Ct. App. 2007).

By her failure to timely object, Mother has waived her challenge to the admission of Kirk's testimony. In addition, it is difficult if not impossible to discern exactly which part of Kirk's testimony Mother would have us deem inadmissible. While some of Kirk's knowledge of the case was based upon her review of records, not all of it was. Kirk was on the case for around six weeks leading up to trial and she had interacted with Mother. We find no reversible error in the Juvenile Court's consideration of Kirk's testimony.

Turning to grounds for termination, we address whether the Juvenile Court erred in finding that the ground of abandonment by failure to support was proven against Mother. The record shows that Mother failed to pay child support during the relevant timeframe for this ground, February 10, 2021 through June 9, 2021. In her brief, Mother argues that the Juvenile Court should have considered Mother's child support payments made after DCS filed its petition. However, Mother's failure to pay child support in the relevant statutory period may not be repented of by her paying child support in some other period of time. Mother has established no affirmative defense to her failure to pay child support in the relevant timeframe. We find, as did the Juvenile Court, that the ground of abandonment by failure to support was proven against Mother by clear and convincing evidence.

We next address whether the Juvenile Court erred in finding that the ground of substantial noncompliance with the permanency plans was proven against Mother. Mother argues that the Juvenile Court erred by finding that she failed to "substantially comply" with the permanency plans as opposed to finding her in "substantial noncompliance." Mother also states that she completed an alcohol and drug abuse assessment along with her in-patient rehabilitation program; that there is no evidence she lives with an inappropriate person; that there is no evidence beyond a statement of counsel that Mother was arrested

on the day of the hearing; that the Juvenile Court failed to weigh the "core" elements of the permanency plans; and that her completion of an in-patient rehabilitation program and all of her parenting classes demonstrates that she was not in substantial noncompliance with her permanency plans.

Mother is correct in that this ground requires proof of "substantial noncompliance" with a permanency plan rather than proof of failure to "substantially comply." However, elsewhere in its findings relative to this ground, the Juvenile Court used the correct formulation, "substantial noncompliance." The Juvenile Court also quoted the ground, discussed it, and cited caselaw about it. We are satisfied that the Juvenile Court, although it used the wrong formulation "substantially comply" at one point, understood the distinction with "substantial noncompliance" and did not apply an erroneous standard. With respect to Mother's assertion that there is no evidence she was arrested the day of the hearing, we note that her own motion to reconsider asserts she was arrested that day. Indeed, that is the central basis of her motion. Mother's other arguments relative to this ground implicate the Juvenile Court's factual findings. Upon our review of the record, we conclude that the evidence does not preponderate against the Juvenile Court's factual findings. Mother did not follow through with her drug treatment; did not adhere to aftercare instructions; and would not even tell DCS her address. In a case where drugs and lack of suitable housing were at the forefront in preventing reunification, these were indeed core, substantial instances of noncompliance with the permanency plans on Mother's part. We find, as did the Juvenile Court, that the ground of substantial noncompliance with the permanency plans was proven against Mother by clear and convincing evidence.

We next address whether the ground of persistent conditions was proven against Mother. The Children were removed from Mother's care in November 2019; DCS filed a petition alleging dependency and neglect; and the termination petition was first set to be heard in November 2021, more than six months after the Children were removed. Thus, the initial element of this ground is satisfied. Regarding the other elements, Mother argues that one positive drug screen does not amount to clear and convincing evidence to prove the ground of persistent conditions against her. However, that was not the sole evidentiary basis for the Juvenile Court's finding as to this ground. The Juvenile Court found that drug issues, inappropriate housing, and criminal issues still persisted in Mother's life. Furthermore, contrary to Mother's contention, it was perfectly legitimate for the Juvenile Court to consider and weigh heavily Mother's failed drug test from one week before trial as part of its analysis on the ground of persistent conditions. Mother's testing positive for drugs a week before trial, in a case where drug abuse was a major reason for the Children's removal into state custody some two years before the termination trial, strongly reflects that Mother's drug problem persists. The evidence does not preponderate against the Juvenile Court's factual findings relative to this issue.

We find that the conditions leading to the Children's removal still persist; that there is little likelihood these conditions will be remedied at an early date so that the Children can safely return to the home; and that continuation of the parent-child relationship greatly diminishes the Children's chances of being placed into a safe, stable, and permanent home. In sum, we find, as did the Juvenile Court, that the ground of persistent conditions was proven against Mother by clear and convincing evidence.

We next address whether the Juvenile Court erred in finding that the ground of severe child abuse was proven against Mother. We have previously determined that a prior finding by a juvenile court in dependency and neglect proceedings can be *res judicata* in parental rights termination proceedings. *See In re Dakota C.R.*, 404 S.W.3d 484, 497 (Tenn. Ct. App. 2012). In those cases, the doctrine of *res judicata* prevents the issue from being re-litigated in the subsequent parental rights termination proceeding. *Id.* In September 2020, the Juvenile Court found that a half-sibling of the Children was a victim of severe child abuse perpetrated by Mother as defined at Tenn. Code Ann. § 37-1-102(b)(27).[8] The severe child abuse finding was based upon in utero exposure to methamphetamine and THC. The record contains no evidence that Mother ever appealed this finding. Mother does not challenge the finality or validity of the order finding severe child abuse. *Res judicata* thus applies to this ground. In view of these facts, we find, as did the Juvenile Court, that the ground of severe child abuse was proven against Mother by clear and convincing evidence.

We next address whether the Juvenile Court erred in finding that the ground of failure to manifest an ability and willingness to assume custody was proven against Mother. With regard to the requirements for the first prong of this ground, the Tennessee Supreme Court has explained:

> [W]e conclude that section 36-1-113(g)(14) places a conjunctive obligation on a parent or guardian to manifest both an ability and willingness to personally assume legal and physical custody or financial responsibility for the child. If a person seeking to terminate parental rights proves by clear and convincing proof that a parent or guardian has failed to manifest either ability or willingness, then the first prong of the statute is satisfied.

*In re Neveah M.*, 614 S.W.3d 659, 677 (Tenn. 2020) (citation omitted).

---

[8] Tenn. Code Ann. § 36-1-113(g)(4) (West April 22, 2021 to June 30, 2021) encompassed severe child abuse against "any child[.]"

-22-

Mother makes various arguments on this ground, to wit: that the Juvenile Court wrongly found that Mother failed to support the Children; that the Juvenile Court wrongly held against Mother her refusal to give DCS her address; that the Juvenile Court made no findings concerning the Children's physical or psychological wellbeing; that the Juvenile Court inappropriately shifted the burden to Mother as evidenced by its finding that "[n]either parent has provided any proof that they are ready to assume physical custody of the children"; and that the Juvenile Court made no finding that the Children were at risk of substantial harm should they be returned to Mother.

Addressing Mother's points, while she did in fact pay some child support, she did so only after DCS filed its termination petition. Further, it was appropriate for the Juvenile Court to consider Mother's refusal to disclose her address in connection with this ground. Whether Mother is able or willing to assume custody of the Children stems in no small part on her ability or willingness to provide suitable housing for them. Mother's refusal to disclose her address demonstrates neither an ability nor willingness to parent the Children, in fact, it reflects a lack of seriousness about the whole process of reunifying with the Children. With respect to Mother's contention that the Juvenile Court inappropriately shifted the burden to her on this ground, we believe that the Juvenile Court simply made a correct observation—that is, Mother put on no proof in opposition to DCS's proof that she was not ready to assume physical custody of the Children. That is quite a different thing from shifting the burden of proof onto Mother. We find, as did the Juvenile Court, that the first prong of this ground was proven against Mother by clear and convincing evidence in that Mother failed to manifest an ability to personally assume legal and physical custody or financial responsibility of the Children.

However, there is a second prong to contend with on this ground. Both prongs must be proven. Mother correctly points out that the Juvenile Court failed to make specific factual findings concerning the second prong of whether placing the Children in Mother's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the Children. A trial court's failure to make factual findings regarding the second prong of the ground of failure to manifest an ability and willingness to assume custody is a basis for vacating the ground. *See* Tenn. Code Ann. § 36-1-113(k) ("The court shall enter an order that makes specific findings of fact and conclusions of law….") (West April 22, 2021 to June 30, 2021). In theory, the same factual findings that sustain the first prong could also sustain the second prong. Here, however, the Juvenile Court never specifically tied its factual findings made in connection with the first prong to the second prong; it just made a bare-bones conclusion of law. Given the Juvenile Court's failure to make specific findings regarding the second prong of this ground, we vacate the ground of failure to manifest an ability and willingness to assume custody.

-23-

Having affirmed certain grounds for termination, the final issue we address is whether the Juvenile Court erred in finding that termination of Mother's parental rights is in the Children's best interest. On June 10, 2021, when DCS filed its petition, the best interest factors read as follows:

(i)(1) In determining whether termination of parental or guardianship rights is in the best interest of the child, the court shall consider all relevant and child-centered factors applicable to the particular case before the court. Those factors may include, but are not limited to, the following:
(A) The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;
(B) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;
(C) Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;
(D) Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;
(E) Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;
(F) Whether the child is fearful of living in the parent's home;
(G) Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;
(H) Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;
(I) Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;
(J) Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;

-24-

(K) Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

(L) Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

(M) Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

(N) Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;

(O) Whether the parent has ever provided safe and stable care for the child or any other child;

(P) Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

(Q) Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;

(R) Whether the physical environment of the parent's home is healthy and safe for the child;

(S) Whether the parent has consistently provided more than token financial support for the child; and

(T) Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

(2) When considering the factors set forth in subdivision (i)(1), the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest.

(3) All factors considered by the court to be applicable to a particular case must be identified and supported by specific findings of fact in the court's written order.

(4) Expert testimony is not required to prove or disprove any factor by any party.

(5) As used in this subsection (i), "parent" includes guardian.

Tenn. Code Ann. § 36-1-113(i) (West April 22, 2021 to June 30, 2021).

With regard to making a determination concerning a child's best interest, the Tennessee Supreme Court has instructed:

When conducting the best interests analysis, courts must consider nine statutory factors listed in Tennessee Code Annotated section 36-1-113(i). These statutory factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interests analysis. *In re Carrington H.*, 483 S.W.3d at 523 (citing *In re Audrey S.*, 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005)). Facts considered in the best interests analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." *In re Kaliyah S.*, 455 S.W.3d at 555 (citing *In re Audrey S.*, 182 S.W.3d at 861). "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]." *Id*. When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." *In re Audrey S.*, 182 S.W.3d at 878. Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. *Id*. "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child. . . ." Tenn. Code Ann. § 36-1-101(d) (2017).

Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors. *In re Audrey S.*, 182 S.W.3d at 878. And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination. *White v. Moody*, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004). Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case. *See In re Audrey S.*, 182 S.W.3d at 878. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated. *In re Carrington H.*, 483 S.W.3d at 523. "[D]epending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." *In re Audrey S.*, 182 S.W.3d at 878 (citing *White v. Moody*, 171 S.W.3d at 194). But this does not mean that a court is relieved of the obligation of considering all the factors and all the proof. Even if the circumstances of a particular case ultimately result in the court ascribing more weight—even outcome

determinative weight—to a particular statutory factor, the court must consider all of the statutory factors, as well as any other relevant proof any party offers.

*In re Gabriella D.*, 531 S.W.3d 662, 681-82 (Tenn. 2017).[9]

Mother makes several arguments as to why, in her view, the Juvenile Court erred in its best interest analysis, to wit: there was no evidence that the Children's foster parents could "support" the Children's therapy; that Mother visited the Children; that Mother completed several services through her permanency plans; that Mother had not "consistently failed" drug screens for methamphetamine; that Mother paid more than token child support; and that there was no evidence regarding Mother's mental or emotional fitness such that Mother's alleged unfitness in those areas bore on the Children's best interest.

While granting that Mother paid some child support, albeit tardily, Mother's other points are not well-taken. Foster Father's uncontroverted testimony was that the Children are in a stable environment and their needs are being attended to. Meanwhile, Mother tested positive for methamphetamine and THC a mere week before trial and she refused to give DCS her address. Mother's completion of certain services through her permanency plans is commendable but insufficient. She clearly has significant, unresolved issues impairing her ability to safely parent the Children, particularly with respect to drugs and her housing situation. Finally, while Mother has engaged in some manner of visitation with the Children, these visits were sporadic and not very meaningful. In contrast, the evidence shows that the Children are in a loving, stable home with foster parents who want to adopt them. The Juvenile Court made detailed findings, which are quoted above, considering each of the statutory best interest factors found at Tenn. Code Ann. § 36-1-113(i). The evidence does not preponderate against the Juvenile Court's findings relative to the Children's best interest. We find by clear and convincing evidence, as did the Juvenile Court, that termination of Mother's parental rights is in the Children's best interest.

---

[9] In *In re Gabriella D.*, a prior version of the best interest factors was in effect. However, we believe the Tennessee Supreme Court's analysis applies to the amended version of Tenn. Code Ann. § 36-1-113(i), as well.

## Conclusion

We vacate the ground of failure to manifest an ability and willingness to assume custody. We affirm the Juvenile Court's judgment in all other respects, including the termination of Mother's parental rights to the Children. The judgment of the Juvenile Court is thus affirmed as modified, and this cause is remanded to the Juvenile Court for collection of the costs below. The costs on appeal are assessed against the Appellant, Pamela C., and her surety, if any.

_____
D. MICHAEL SWINEY, CHIEF JUDGE